UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
WINIFRED OWENS,                                                     **MEMORANDUM & ORDER**
                                                                    05 CV 5987
                         Plaintiff,

         -against-

JANET NAPOLITANO, SECRETARY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

                         Defendant.
-----------------------------------------------------------X
DEARIE, Chief Judge.

Winifred Owens claims that while working as a Customs and Border Protection Officer ("CBPO") in the Canine Unit of the United States Bureau of Customs and Border Protection ("CBP") at John F. Kennedy International Airport ("JFK"), she was discriminated against and subjected to a hostile work environment because of her race and age. She also asserts that she was retaliated against because she complained of discrimination. Her claims are brought under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"). Defendant moves to dismiss Owens's claims pursuant to Federal Rule of Civil Procedure 12(c), or, in the alternative, for summary judgment. For the reasons that follow, Owens's complaint is dismissed in its entirety.

## BACKGROUND

Unless otherwise noted, the following facts are not in dispute. Owens, an African-American woman who at all relevant times was 40 years of age or older, began working at CBP in 1970. From 1970 to 1996, Owens worked in various positions, including as a clerk, Customs Patrol Officer, Customs Inspector, and Seized Property Custodian. In 1996, she began working as a CBPO following her graduation from the Canine Enforcement Training Center. Her

responsibilities as a CBPO included searching cargo and baggage for narcotics and contraband, caring for her canine partner, keeping her government car clean, and handing in her monthly seizure reports. Owens retired from the CBP in May 2007 when she was 55 years old.

Owens's claims stem from events beginning on July 1, 2004. On that date, Owens side-swiped a guard rail while driving her government-issued vehicle in the CBP's parking lot at JFK. The collision resulted in considerable damage to the vehicle; three repair estimates were obtained in the amounts of $2,124, $2,720, and $3,370. Owens was aware that CBP policy required her to report motor vehicle accidents as soon as possible and before she completed her tour.[1] Nevertheless, Owens, who was very upset with herself for side-swiping the guard rail, parked the damaged vehicle, put her canine partner in the CBP's kennel, and went home without reporting the incident. She did not report the incident until the next morning, July 2, when she called JFK Canine Branch Deputy Chief Gary Walck and left him a voicemail explaining what had happened. When asked why she did not report the incident before she left work, Owens testified that, in addition to being upset with herself, she believed that she was not required to file a report because no other vehicles were involved.[2]

Owens returned to work on July 6, 2004. At Deputy Chief Walck's direction, Owens met with her immediate supervisor, Supervisory CBPO ("SCBPO") Cynthia Grob, a 32 year old Caucasian. Owens and Grob had worked together as canine officers before Grob became

---

[1] The U.S. Customs Vehicle Management Handbook provides that "a vehicle accident is defined as a reportable accident involving a Customs employee, who, while in the performance of official or work related duties, becomes involved in a motor vehicle accident which results in personal injury and/or property damage."

[2] Prior to the July 1 incident, Owens was involved in at least three collisions involving other vehicles while operating her government vehicle; she immediately reported the incidents to her supervisors.

2

Owens's supervisor. According to Owens, the women had had a "very good," "very close" friendship; they treated each other to lunch and exchanged gifts for Christmas and on other occasions, and Grob loaned Owens money on at least two occasions and drove Owens to and from work. (Owens July 27, 2007 Dep. Tr. at 77-82.) Their relationship soured, however, immediately upon Grob becoming Owens's supervisor. (Owens June 6, 2005 EEOC Dep. Tr. at 20.)

At the July 6 meeting, Grob reminded Owens that CBP procedure required employees involved in a motor vehicle accident to prepare an accident report and to notify a supervisor immediately. During the meeting, Grob noted on Owens's "7B card" -- a personnel card that each CBP employee has on file -- that she had verbally counseled[3] Owens on proper reporting procedure. The notation, which read, "7-6-04 – on this date, CEO Owens was counseled on the proper procedures for reporting accidents/damage to her GOV," was made in pencil (as are all notations made to a CBP employee's 7B cards). Grob explained to Owens that the notation would be erased from her 7B card in six months so long as Owens had no further incidents with a government-issued vehicle. Grob testified that she also told Owens that if Owens applied for a promotion, Grob would erase the notation; Owens denies Grob telling her so. In any event, there is no dispute that Grob erased the notation six months later on January 5, 2005.

On July 8, 2004, Owens contacted a CBP Equal Employment Opportunity ("EEO") counselor claiming that she had been discriminated against on account of her race when Grob verbally reprimanded her and placed the notation on her 7B card. During the course of the EEO counselor's investigation into Owens's claim, Owens added a claim of age discrimination against

---

[3] Owens disputes the characterization that she was "counseled"; she claims that Grob reprimanded her.

Grob. On August 18, 2004, Owens was issued a notice of right to file a formal complaint with the CBP.

Owens filed a formal complaint with the CBP on August 24, 2004, reasserting her claims that Grob had reprimanded her at the July 6 meeting because of her race and age. While the CBP was formally investigating Owens's allegations, Owens further claimed that she was subjected to a hostile work environment based on her race and age when:

(1) SCBPO Grob issued her a written reprimand on July 6;

(2) At the July 6 meeting in Grob's office, Grob dismantled her service weapon while facing her;

(3) Soon after the July 6 meeting, she found "flower weeds," which she viewed as a "symbol of death," stuffed in the hole on the passenger side of her government vehicle that resulted from her side-swiping the guardrail;

(4) SCBPO Grob told her to submit her monthly paperwork, and yelled at her a few days later indicating that she needed the paperwork immediately;

(5) SCBPO Grob made comments about her health and body odor on several occasions including telling her that she smelled "like shit," "dead fish," and "rotten meat"; and

(6) On October 24, 2004, and on October 31, 2004, she found a brown envelope containing a photograph of SCBPO Grob, Grob's canine partner, and CBP Commissioner Robert Bonner in her personal mailbox at work. She further alleged that on November 8, 2004, she found several copies of the photo in her pseudo-narcotics carrying bag, and in her canine partner's kennel crate.

On September 19, 2005, CBP issued a final agency decision ruling that Owens had, among other things, failed to show that any of the actions that she complained of affected a material term or condition of her employment or created a hostile work environment, and that Owens had failed to show that CBP discriminated against her on the basis of her race or age.

Owens filed a complaint in this Court on December 23, 2005 ("Owens I"). Owens asserts the same six allegations that she raised in her formal CBP complaint and she includes two

4

additional allegations. First, on at least one occasion Grob commented to her that she (Owens) would be named a supervisor because she is African-American. Second, that on November 23, 2005, she was "advised, without cause, that she was not permitted to work with her K-9 partner, that she had to surrender her weapon and that she could not work overtime."

While Owens I was pending, Owens contacted a CBP EEO counselor on September 7, 2006, claiming that she had been subjected to a hostile work environment because of her gender, age, and national origin, and in retaliation for complaining of discrimination. Specifically, Owens alleged that in February 2006, she was questioned by a CBP investigator in connection with allegations that she had been sleeping in her personal vehicle at CBP's parking lot at JFK after work hours -- allegations that Owens admits were true -- and that on September 5, 2006, she was asked to submit a memorandum documenting the misplacement of her radio and charger on her previous shift. On October 6, 2006, Owens filed a formal complaint with the CBP alleging discrimination based on race, color, gender, age and hostile work environment. After receiving Owens's responses to its requests for additional information, CBP construed Owens's allegations as follows:

(1) On November 23, 2005, management removed her government issued firearm and did not return it until February 9, 2006, when she submitted a memorandum;

(2) On November 23, 2005, she was reassigned from the Canine Unit to Passenger Processing;

(3) In February 2006, she was the subject of an administrative inquiry regarding allegations that she was sleeping in her personal vehicle at the worksite and was seen in the CBP building after work;

(4) on March 8, 2006, she was required to write a memorandum documenting a scheduled change to one of her firearms session;

(5) on September 5, 2006, she was required to write a memorandum documenting the misplacement of her radio charger;

(6) on December 7, 2006, she was required to write a memorandum documenting why her radio was not placed in its charger; and

(7) for years, two coworkers have used the "N" word and had made repeated reference to her nappy hair.

On March 1, 2007, CBP issued a final agency decision dismissing Owens's complaint. In doing so, CBP concluded that many of Owens's allegations were not administratively exhausted pursuant to EEOC regulations and that her allegations had failed to state a claim of discrimination. Owens filed her second complaint in this Court on May 17, 2007 ("Owens II"), reiterating her claims of discrimination, hostile work environment, and retaliation.

Owens I and Owens II have been consolidated. Discovery is closed. Defendant moves for dismissal of several of Owens's claims arguing that Owens failed to timely exhaust the administrative remedies available to her under EEOC regulations prior to filing her lawsuit. Alternatively, defendant moves for summary judgment arguing that Owens has failed to establish her prima facie case under McDonnell Douglas with respect to any of her claims.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). On a motion for summary judgment, the trial court "must first resolve all ambiguities and draw all inferences in favor of the non-moving party, and then determine whether a rational jury could find for that party." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000) (citation omitted). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d

Cir. 2000) (quoting Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991)). The non-moving party, however, "may not rely on conclusory allegations or unsubstantiated speculation" in seeking to avoid summary judgment, Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001) (internal citation omitted), and summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

To avoid summary judgment in a Title VII case, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir. 2008) (citation and quotation marks omitted).[4] Under the familiar McDonnell Douglas burden-shifting summary judgment standard applicable to discrimination claims, the plaintiff bears the initial burden of establishing a prima facie case of discrimination, namely: 1) that she belonged to a protected class; 2) that she was qualified for the position she held; 3) that she suffered an adverse employment action; and 4) that the purported adverse employment action that she suffered occurred under circumstances giving rise to an inference of discrimination. See Fleming v. MaxMara USA, Inc., 644 F. Supp. 2d 247, 261 (E.D.N.Y. 2009) (citing Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004)). Although plaintiff's burden at the prima facie stage is minimal, she must provide some competent evidence that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. See Patrick v. New York City Transit Auth., 2007

---

[4] In an ADEA case, the plaintiff must come forward with sufficient evidence from which a reasonable juror could conclude that her age was the "but-for" cause of the employment decision. See Hogan v. J.P. Morgan Chase Bank, 2010 WL 4847032, at *2 (2d Cir. Nov. 30, 2010) (citing Gross v. FBL Financial Services, Inc., --- U.S. ----, 129 S.Ct. 2343, 2352 (2009).

7

WL 2071555, at *11 (E.D.N.Y. July 16, 2007) (citing Cronin v. Aetna Life Ins., 46 F.3d 196, 204 (2d Cir. 1995)). If the plaintiff establishes a prima facie case, "[t]he burden then shifts to the employer who must provide a legitimate, nondiscriminatory business rationale to justify its conduct." Clemente, 684 F. Supp. 2d at 374 (citing Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)). The employer's burden is "not a demanding one." Bickerstaff, 196 F.3d at 446. If the employer meet its burden, "the presumption raised by the prima facie case is rebutted, and drops from the case," id. (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993) (internal quotations and citations omitted), and the plaintiff must show, "without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." Holcomb, 521 F.3d at 138. Although the burden shifts, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. (quoting Burdine, 450 U.S. at 253).

As for a hostile work environment claim, at the summary judgment stage, the plaintiff must "proffer sufficient evidence to allow a trier of fact to find disparate treatment based on [race], resulting in a hostile working environment that was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Pucino v. Verizon Wireless Communications, Inc., 618 F.3d 112, 117 (2d Cir. 2010) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

II. Owens I

A. Time-Barred Claims

Owens's claims that she was discriminated against and subjected to a hostile work environment because of her race and age when on November 23, 2005, she was "advised, without cause, that she was not permitted to work with her K-9 partner, that she had to surrender

8

her weapon and that she could not work overtime," are time-barred. Prior to bringing suit under either Title VII or the ADEA, a federal employee "must exhaust available administrative remedies, including all remedies provided by applicable EEOC regulations." Khaleel v. Potter, 307 Fed. Appx. 527, 529 (2d Cir. Jan. 21, 2009) (citing Belgrave v. Pena, 254 F.3d 384, 386 (2d Cir. 2001) (noting that exhaustion requirement applies to both Title VII and ADEA)). Owens was required to "consult with a counselor at the relevant agency's Equal Employment Office ("EEO") within 45 days of the alleged discriminatory act." Id. (quoting Belgrave, 245 F.3d at 386). The 45-day exhaustion requirement is analogous to a statute of limitations and an employee's failure to demonstrate why her failure to comply with administrative requirements should be excused because of waiver, estoppel or equitable tolling, warrants dismissal of a discrimination claim later brought in federal court. See Khaleel, 307 Fed. Appx. at 529 (affirming district court's dismissal of Title VII claims for employee's failure to properly exhaust his EEOC's administrative remedies) (citing Briones v. Runyon, 101 F.3d 287, 290 (2d Cir. 1996)). Because it is undisputed that Owens never raised the November 23, 2005 incident with an EEO counselor, and because she has not demonstrated that her failure to do so should be excused, her claims are dismissed.

Even if timely, Owens's claims would still be dismissed. The uncontroverted evidence is that on November 23, 2005, Owens told Deputy Chief Richard Treacy that because of Grob's "threatening actions," she feared for her canine partner's safety, her own safety and her government property, and she requested that Grob no longer be her supervisor.[5] Because Owens

---

[5] Between October 2004 and November 2005, the only additional allegations that Owens made of Grob's purported threatening behavior were that on one occasion Grob was "walking back and forth pretending to be taking notes" and that she just "stayed in the open area watching me work," and that on another occasion Grob was waiting for her near the sign-in sheet and that

9

alleged that she feared for her safety, CBP officials decided to temporarily take away both women's firearms and temporarily transfer Owens to another unit in an effort to separate the two women while Owens's allegations were investigated. Owens was reissued her firearm and returned to the Canine Unit 10 weeks later after her request to resume her duties as a CBPO was approved on February 8, 2006. When asked why she believed that her reassignment was discriminatory, Owens responded that although she "had not done anything wrong" and "she was not the one under investigation," she, rather than Grob, her Caucasian supervisor, was temporarily reassigned. On this record, no reasonable juror could conclude that Owens, who complained to management and asked that Grob no longer be her supervisor, was temporarily reassigned because of her race or age.

Nor was Owens's temporary reassignment a materially adverse employment action. For an action to be considered materially adverse under Title VII, it must rise to the level of "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (quoting Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004)). While Owens alleges that her responsibilities changed when she was transferred (e.g., she did not work as a canine officer and she was not permitted to work with her canine partner) she understood that the reassignment was only temporary while the investigation into her allegations against Grob was completed. Further, contrary to Owens's allegation that she was denied overtime as a result of the transfer, Owens concedes that she earned nearly $6,000 in overtime during the 10 week period that she was reassigned. In any event, even if the temporary

---

when she (Owens) approached, Grob said "here comes Winnie." Owens felt threatened because she felt that Grob was waiting for her and "said her name."

transfer was materially adverse, it appears to have been an eminently reasonable response by CBP to separate the two women while the investigation into Owens's allegations was pending.

B. <u>Hostile Work Environment Claims</u>

The hostile work environment claims that Owens asserts in Owens I that are not time-barred are also dismissed. As an initial matter, the Court notes that Grob denies taking any of the actions that Owens complains about. At the summary judgment stage, however, the Court must construe the evidence in the light most favorable to Owens, and the Court therefore assumes that Grob took all of the actions that Owens complains about. Nevertheless, Owens has not come forward with any evidence from which a reasonable juror could conclude that Grob was motivated to act, in whole or in part, because of Owens's race or age.

First, Owens has not come forward with any direct evidence of race-based or age-based animus; she does not allege that Grob -- or anyone else for that matter -- made any derogatory comments about her age, and the sole comment that touched on her race is Grob's alleged comment that because Owens is African-American, she would be promoted to supervisor. This comment -- made just once at some unspecified time before Grob became Owens's supervisor -- does not by itself raise an inference of discriminatory animus.

Nor has Owens come forward with any circumstantial evidence of discriminatory animus. Owens's allegations that Grob was "laughing," "seemed very elated," and acted "like this was the best thing that ever happened to her," when she reprimanded Owens at the July 6 meeting, are not sufficient to raise an inference of discrimination. Nor is her allegation that two younger, Caucasian CBPO officers were not reprimanded and did not receive notations on their 7B cards even though they, like she, had failed to timely report accidents with their government vehicles. Owens admits that she has no personal knowledge of the facts and circumstances surrounding the

11

purported incidents involving the two officers, but that she is merely repeating rumors that she had "heard through the grapevine." Owens's "evidence" is inadmissible hearsay, which cannot defeat defendant's motion. See McManamon v. City of New York City Dept. of Corrections, 2009 WL 2972633, at *6 (S.D.N.Y. Sept. 16, 2009) ("Plaintiff's report that he had heard rumors regarding a possible age limit, however, is inadmissible hearsay and cannot be relied upon in opposition to a motion for summary judgment.") (citing Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."); Massa v. New York City Housing Authority, 1996 WL 655812, at *3 n.5 (S.D.N.Y. Nov. 8, 1996).

Similarly insufficient to raise an inference of discrimination are Grob's alleged comments that Owens smelled "like shit," "dead fish," and "rotten meat." When Owens was asked why she believed that these race-neutral and age-neutral comments evidence discriminatory animus, Owens testified that it was because they suggest "disrespect." The comments are clearly disrespectful; but that they are "disrespectful" does not give rise to an inference of discrimination. At bottom, aside from Owens's personal belief that Grob discriminated against her, the record lacks any evidence from which a reasonable juror could conclude that any of Grob's purported actions, including: (1) placing "flower weeds" in the hole of Owens's damaged vehicle; (2) yelling at Owens on one occasion and telling her in a "firm" voice on another occasion to submit her paperwork on time[6]; (3) dismantling her firearm while facing Owens at

---

[6] Owens claims that Grob yelled at her to get her paperwork in on time but did not yell at the three other canine officers on Owens's tour because the other officers are Caucasian. Besides not having first-hand knowledge of whether Grob "yelled" at the other officers, Owens admits that it was a supervisor's responsibility to remind employees to submit paperwork on time and that supervisors other than Grob had previously reminded her to submit her paperwork on time. Moreover, Owens admits that race was just one reason why Grob yelled at her and not the other officers; according to Owens, Grob did not yell at Wayne Clark because, presumably unlike

12

the July 6 meeting;[7] and (4) placing copies of a photo of herself, her canine partner, and CBP Commissioner Robert Bonner in Owens's personal mailbox and in Owens's narcotics bag, was in any way related to Owens's race or age. While the alleged actions have no place in the workplace, they do not raise a cognizable claim of hostile work environment under either Title VII or the ADEA. See e.g., Bolden v. Potter, 2010 WL 1286756, at *4 (D. Conn. Mar. 29, 2010) (citing Lizardo v. Denny's, Inc., 270 F.3d 94, 102 (2d Cir. 2001) ("Although mistreatment by defendants is not irrelevant in assessing the strength of plaintiffs' circumstantial evidence of race-based animus, it is certainly not sufficient to establish it.")).

C. Discrimination Claims

In addition to failing to come forward with any evidence giving rise to an inference of discriminatory animus, Owens has also failed to establish that any of Grob's actions were sufficiently adverse to trigger liability under the substantive anti-discrimination provisions of either Title VII or the ADEA. Indeed, none of Grob's alleged adverse actions comes anywhere close to this level. See e.g., Singh v. New York City Off-Track Betting Corp., 2005 WL 1354038, at *8 (S.D.N.Y. June 8, 2005) ("The written reprimands issued to the plaintiff did not result in suspension or any loss of wages, title, benefits, or responsibilities, or any other material change in the plaintiff's working conditions.") (citing Weeks v. New York State Div. of Parole, 273 F.3d 76, 86 (2d Cir. 2001)); Abram v. City of Buffalo, 2011 WL 334297, at *10 (W.D.N.Y.

---

Owens, Clark's a "tough guy" and "nobody messes with Wayne Clark, nobody," or at Jimmy Walsh because "he's kind of tough himself," or at Jennifer Montgomery because "she'd go to the union."

[7] Grob denies dismantling her service weapon during the meeting, but admits that she removed rounds from her spare magazines because she was preparing for her scheduled practice at the CBP's shooting range immediately after the meeting. Owens does not dispute that Grob was preparing to go to the shooting range after their meeting.

13

Jan. 28, 2011) ("Abram has not offered testimony or evidence indicating that a requirement to fill out this form is anything more than a mere inconvenience. There is nothing in the record to suggest that filling out P-73 forms resulted in any loss of salary, benefits, seniority, tenure, promotion opportunities, or other material adverse consequence."). Accordingly, Owens has failed to make out a prima facie case of discrimination and her claims are dismissed.

D. Retaliation

In Owens I, Owens only asserts claims of discrimination and hostile work environment. The Court notes that Owens's allegation that she found a photo of Grob, Grob's canine partner, and CBP Commissioner Robert Bonner in her personal mailbox at CBP on October 24, 2004, and on October 31, 2004, as well as several copies of the photo in her narcotics bag and in her canine partner's kennel crate on November 8, 2004, and that she "was very disturbed by this and took it as a threat because, at the time, she had an EEO complaint pending. . . . [and she] believed that SCEO Grob was attempting to intimidate her to drop the complaint because she is an acquaintance of [Commissioner Bonner]," could also support a claim for retaliation. To the extent that Owens intended to raise claims of retaliation under Title VII or the ADEA, the claims are dismissed.[8]

"To establish a prima facie case of retaliation, an employee must show [1] participation in a protected activity known to defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." Stoddard v. Eastman Kodak Co., 309 Fed Appx. 475, 478, 2009 WL 367553 (2d Cir. Feb. 13, 2009) (quoting Richardson v. Comm'n on Human Rights and Opportunities, 532 F.3d 114, 123 (2d Cir. 2008) (citation omitted) (alteration in original)). Title VII's anti-retaliation law

---

[8] Grob denies taking these actions and CBP's records confirm that she was on leave from October 24 to November 2 and was off from work on November 7 and 8.

14

"protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 721 (2d Cir. 2010) (quoting Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (quoting Burlington Northern, 548 U.S. at 68).

The gist of Owens's allegation is that she "felt threatened [] to drop the EEO complaint," when she found the photos because:

> if someone has connections to the commissioner, the commissioner has power, anything could be done to you. You could be transferred, anything. You never know in the government what could happen to you when people know certain people. . . . Or retaliation, I could be transferred, taken off the tour, put on nights. I feel very threatened.

Whether an action is materially adverse under Burlington Northern does not take into account the plaintiff's "unusual subjective feelings"; rather, the test is whether a "reasonable employee" under the circumstances might have been dissuaded from making or supporting a charge of discrimination. See Milne v. Navigant Consulting, 2010 WL 4456853, at *7 (S.D.N.Y. Oct. 27, 2010) (citing Burlington Northern, 548 U.S. at 68-69). Under the circumstances, no reasonable employee might have been dissuaded from supporting a charge of discrimination.

First, the photo was taken at an awards ceremony honoring canine service partners and was subsequently placed on the cover of the CBP's pocket calendar that was distributed to CBP employees. On its face it is hardly threatening. Second, to the extent that Owens argues that she felt threatened when she found the photos because "you never know in the government what could happen to you when people know certain people," on this record, no reasonable employee

15

would believe that Grob wielded enough influence with Bonner that she could use that influence as a means to punish Owens for complaining of discrimination. The only evidence in the record that sheds any light on Grob's and Bonner's relationship is that Grob posed for a photo with Bonner at an awards ceremony and that Grob was assigned to escort Bonner around JFK when Bonner came to the airport on two official visits. Indeed, Owens testified that she "had no belief" as to whether Grob and Bonner were anything more than, as she alleges in her complaint, mere "acquaintances." (Owens July 27, 2007 Dep. Tr. at 109-116.) Further, though not dispositive, the Court notes that Owens was not dissuaded from reporting to CBP management that Grob had placed the photos in her mailbox and narcotics bag; she filed a complaint two days after finding the photos in her narcotics bag. Based on this record, no reasonable employee would have been dissuaded from complaining of discrimination.

## III. Owens II

Several of the claims raised in Owens II are dismissed as time-barred. It is undisputed that Owens never consulted with an EEO counselor regarding her allegations that she was discriminated against and subjected to a hostile work environment when: (1) in March 2006, SCBPO Michael Lake, her new supervisor, instructed her to write a memorandum in reference to a scheduled change to one of her firearms session; and (2) "for years" two of her coworkers used the "N" word and remarked that she had "nappy hair."[9] Owens has not come forward with any reason why her failure to raise these issues with an EEO counselor should be excused; accordingly, the claims remain administratively unexhausted and are dismissed.

---

[9] Owens admits that she never heard her co-workers make these comments. Rather, she alleges that another co-worker explained to her that two o-workers were using military-type codes over their radios to convey the terms "nigger" and "nappy hair." She further testified that she was unsure when the conduct began, how many times it occurred or for how long the conduct lasted. (Owens Nov. 20, 2008 Dep. Tr. at 198-206.)

It is also undisputed that although Owens consulted an EEO counselor regarding her allegations that she was discriminated against in February 2006 when she was investigated for sleeping in her personal vehicle at CBP's parking lot at JFK, she did not do so until September 2006.[10] Owens has again failed to come forward with any reason why her failure to consult an EEO counselor within 45 days of the incidents should be excused. Accordingly, the Court is barred from reviewing these claims.

As for Owens's allegations that were timely raised with an EEO counselor, that is, her allegations that on September 5, 2006, SCBPO Anthony Strasser required her to write a memorandum documenting why her radio charger was left overnight in the CBP gym, and that on December 7, 2006, Strasser required her to write a memorandum documenting why her radio was not placed in its overnight charger,[11] Owens cannot establish that being required to prepare two two-paragraph memorandums over a period of three months constitutes materially adverse

---

[10] In any event, Owens admits that the allegations that she slept in her work vehicle in the parking lot after work hours were true. The reason: she had recently moved to Pennsylvania and was too tired after work to drive for two hours. Owens was told to update her address with CBP and the matter was closed. Nevertheless, Owens claims that the investigation was discriminatory because upper management knew that other employees, who are Caucasian, were also "living in Building 77 and/or sleeping in their cars," but that they were not investigated. Defendant has come forward with documentary evidence that at about the same time Owens was being investigated, another CBP employee was investigated and formally reprimanded for remaining in CBP's building after his tour had ended.

[11] Although Owens denies that she misplaced her radio charger and denies that she failed to place her radio in its overnight charger, she testified that while she was unaware that CBP policy required documentation in such situations, it was not inappropriate for Strasser to require her to document what had happened. She claims, however, that Strasser only made her write the memorandums because of her race and as proof she alleges that a Caucasian canine officer had left his loaded weapon in the CBP gym (which is where her charger was found), but that the officer was, unlike her, not asked to write a memorandum. Owens admits, however, that she has no first-hand knowledge of the alleged gun incident and that she did not know whether Strasser was even the officer's supervisor at the time of the incident. In any event, as discussed, requiring a subordinate to write two short memorandums does not constitute a materially adverse action or create a hostile working environment.

employment actions sufficient to support a claim of discrimination under Title VII. Accordingly, her claims of discrimination based on these allegations are dismissed. Nor does requiring Owens to write two short memorandums over a period of three months constitute a hostile working environment. Accordingly, her hostile work environment claims are dismissed. Finally, no reasonable juror could conclude on this record that SCBPO Strasser took these actions because of Owens's prior complaints of discrimination or that requiring Owens to prepare the two memorandums over a span of three months constituted adverse actions even under <u>Burlington Nothern</u>. Accordingly, her retaliation claims fail.

## CONCLUSION

For the foregoing reasons, plaintiff's complaint is dismissed in its entirety. The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2011

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge